IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JOSEPH STANBERRY, SR.,
    Plaintiff,

vs.                                           Case No. 3:10cv534/LAC/EMT

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration,
    Defendant.
_____/

**REPORT AND RECOMMENDATION**

       This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq*. It is now before the court upon Plaintiff's request, and pursuant to 42 U.S.C. § 405(g) of the Act, for review of a final, unfavorable determination made by the Commissioner of Social Security ("Commissioner").[1] Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.     PROCEDURAL HISTORY[2]

       On February 6, 1998, Plaintiff filed an application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34. As a result Plaintiff received a period of disability and DIB, effective November 30, 1997, and he received disability payments through June 2007.

---

[1] The unfavorable determination relates to an alleged overpayment of disability benefits to Plaintiff, as discussed more fully *infra*.

[2] Unless otherwise noted, the information in this section is derived from the opinion of the Administrative Law Judge, found at transcript pages eleven through sixteen (hereinafter, references to the transcript will be noted by "Tr.," followed by the "Bates stamp" page number, found at the upper, right-hand corner of the transcript pages). Additionally, the undersigned notes that the information in this section includes significant detail, but such detail is necessary to properly address Plaintiff's claims and accurately reflect the somewhat complicated procedural history of this case.

On October 23, 2004, the Social Security Administration ("SSA") advised Plaintiff that he was not entitled to DIB during 2002 because he had engaged in substantial gainful work activity that year (Tr. 197). Plaintiff was also advised that he was overpaid in the total amount of $9,459.70 and, therefore, he should refund the overpayment or explain his inability to do so within thirty days (*see* Tr. 198). Plaintiff apparently failed to respond, and on November 29, 2004, the SSA advised Plaintiff of its "new repayment withholding schedule" that would be used to collect the benefits paid in error (Tr. 202). The schedule reflects that $597.20 would be withheld from Plaintiff's December 2004 payment (resulting in $0.00 being paid to Plaintiff), and the same amount would be withheld each month in 2005, as well as in January and February 2006 (*see id.*). Finally, the notice states that $481.70 would be withheld from Plaintiff's March 2006 payment, and the balance of the March payment, $115.50 (597.20 - 481.70 = 115.50), would be paid to Plaintiff. Thus, according to the notice the overpayment was to be made up by withholding $597.20 in 2004, $7,166.40 in 2005 ($597.20 x 12), and $1,676.10 in 2006 ($597.20 x 2 ($1,194.40) + $481.70).[3]

On June 1, 2005, the SSA sent Plaintiff a notice outlining another "new repayment withholding schedule" that would be used to collect the benefits paid in error (Tr. 204). This schedule reflects similar withholdings as the first schedule, but reflects that the fifteen (15) withholdings of $597.20 would occur between June 2005 and August 2006, and the sixteenth withholding, of $481.70, would be withheld from Plaintiff's September 2006 payment (*id.*).[4]

In a notice dated May 31, 2007, the SSA advised Plaintiff that it appeared he had engaged in substantial work activity at various times since the effective date of his DIB award and, therefore,

---

[3] These figures total $9,439.70, although Plaintiff's notice states he was overpaid $9,459.70, a difference of $20.00 (in Plaintiff's favor).

[4] A third "new repayment withholding schedule" was sent to Plaintiff on August 4, 2005, and it reflects that $263.00 would be withheld from Plaintiff's August and September 2005 payments, and Plaintiff would receive $99.60 and $256.00 in those months, respectively (Tr. 206). Additionally, on July 21, 2006, the SSA acknowledged a request by Plaintiff to send his payments directly to a particular financial institution, and the SSA agreed to do so (Tr. 208). The SSA also noted in this correspondence that Plaintiff's monthly payments at that time (i.e., in or about July and August 2006) were $270.00 (*id.*).

he was not entitled to benefits from all of 2002 and from January 2004, forward (Tr. 20–21).[5] The SSA gave Plaintiff until approximately June 15, 2007, to provide additional information if he disagreed, and it advised Plaintiff if he did not timely respond a decision would be made based on the information then possessed by the SSA (Tr. 20, 23). It does not appear that Plaintiff responded. On June 20, 2007, the SSA informed Plaintiff that he was last disabled in September 2001, and he was not entitled to any payments he had received from January 2002 through December 2002, and from January 2004, forward (Tr. 27–29). The SSA explained that although Plaintiff's TWP ended as of October 1, 2001, the SSA pays benefits for the month disability ends and the following two months (Tr. 27). Thus, Plaintiff was entitled to benefits from January through September 2001, which was his TWP, and from October through December 2001, but he was not eligible for benefits from January through December 2002, since he was employed throughout 2002 and earned more than the monthly substantial gainful activity ("SGA") threshold (*see* Tr. 13, 27–28, 31). The SSA also explained to Plaintiff that he had an extended period of eligibility ("EPE"), from October 2001 through September 2004, during which DIB payments could have been restarted if Plaintiff's work was not substantial and his "heath problems still met [SSA] rules" (Tr. 27; *see also* Tr. 11). In 2003, within the EPE window, Plaintiff was employed, but his monthly income was well below the level required to constitute SGA (Tr. 13; *see also* Tr. 28, 31). Thus, Plaintiff was not overpaid in 2003. The SSA concluded, however, that commencing in January 2004 Plaintiff's income exceeded the SGA level (*see* Tr. 28, 31–32). The SSA thus determined that Plaintiff was not entitled to any disability payments between January 2004 and June 2007, and that he was overpaid a total of $27,708.80 during this period, as Plaintiff was advised in a notice dated July 24, 2007 (Tr. 33).[6]

---

[5] The notice also advised Plaintiff that "[g]oing to work does not affect payments right away," because a nine-month trial work period ("TWP") is permitted to test his ability to work despite his health problems (Tr. 21). Plaintiff's TWP was from January 2001 through September 2001 (*see, e.g.*, Tr. 11), and DIB payments made during a TWP are not considered overpayments.

[6] Although the SSA's correspondence from May and June 2007 referenced the overpayment from 2002 (Tr. 20, 27), the correspondence dated July 24, 2007, specifically states that Plaintiff was overpaid from January 2004 though June 2007 in the total amount of $27,708.50 (Tr. 33). The July correspondence does not mention the 2002 overpayments or include any amounts attributable to the 2002 overpayments in the $27,708.50 total (*see* Tr. 33–35).

Case No. 3:10cv534/LAC/EMT

In August 2007, Plaintiff filed a request for reconsideration of the overpayment determination (i.e., that he was overpaid $27,708.50, based on DIB payments made between January 2004 and June 2007). In this request Plaintiff declared under the penalty of perjury that he was disabled and did not engage in SGA "that provided gross monthly earnings above the maximum allowed" (*see* Tr. 36). He also filed a request for waiver of overpayment recovery, in which he stated the overpayments between January 2004 and June 2007 were not his fault, he could not afford to pay the money back, and/or "for some other reason[]," it would be unfair to require him to repay (Tr. 38). In a notice dated August 30, 2007, the SSA notified Plaintiff that it could not waive collection of the overpayment (*see* Tr. 48). Although Plaintiff had filed a written request for reconsideration of the overpayment determination, he later requested that the issue be escalated to a hearing when he appeared at his personal conference. He also filed a timely written request for hearing before an Administrative Law Judge ("ALJ"), and a hearing was scheduled.

Plaintiff's hearing was conducted on April 10, 2008, before ALJ Ricardo M. Ryan (*see* Tr. 216–25). Plaintiff was represented by counsel (*id.*). At the outset of the hearing, Plaintiff's counsel advised ALJ Ryan that Plaintiff's file was complete, she needed no additional time to submit other exhibits, and Plaintiff had no witnesses (Tr. 218–19). Counsel then gave an opening statement, during which she stated that at all relevant times Plaintiff had advised the SSA he was working (Tr. 219). She also stated that the SSA, in concluding that Plaintiff performed SGA in certain years he received DIB, appears to have considered Plaintiff's gross earnings from self-employment, without deducting expenses, and had such expenses been deducted his income would not have exceeded the SGA threshold (Tr. 219–20). To illustrate, counsel pointed to Plaintiff's tax return for 2004, a year in which Plaintiff reported he was a sole proprietor in the "ministry" profession and earned income from Interfaith Jail Ministries ("IJM") (Tr. 220; *see also* Tr. 144). Counsel noted that the 2004 W-2 from IJM reflects gross income in the amount of $10,800.00, but Plaintiff's expenses exceeded his income, so he had no income in 2004 and, correspondingly, no SGA (*see* Tr. 220 (citing Tr. 141, 142)). The ALJ and counsel then discussed an alleged contradiction between Plaintiff's purported self-employment in 2004 and the W-2 reflecting wages from IJM, but portions of this discussion are inaudible and not transcribed (*see* 220–22). Following this discussion, ALJ Ryan gave counsel thirty

days to sort out the alleged tax return discrepancies and thereafter submit a written statement to him, in which she should outline her arguments (*see* Tr. 222–23). The ALJ also told counsel she should "address all issues" in her written correspondence, including any issues related to Plaintiff's finances and ability to repay an overpayment (*id.*).

On or about June 20, 2008, counsel submitted a written statement to ALJ Ryan (Tr. 194–96). In pertinent part, counsel first discussed the "new repayment withholding schedules" issued to Plaintiff. She noted that is was unclear when the SSA began withholding $597.20 from Plaintiff's payments, but regardless of when the withholdings commenced, the SSA must have recouped the original $9,459.70 overpaid to Plaintiff in 2002 and, she noted, the SSA might have collected slightly more than was actually owed based on her calculations (*see* Tr. 194). Next, counsel stated that Plaintiff went to a local SSA office in or about October 2004, after receiving the first overpayment notice (*id.*). According to counsel, Plaintiff requested at that time that he immediately be placed on early Social Security Retirement ("SSR"), in order to avoid any further alleged overpayments (*id.*).[7] But, also according to counsel, the SSA failed to initiate Plaintiff's request for immediate placement on early SSR and continued classifying his monthly payments as DIB (Tr. 195). Counsel then discussed various notices Plaintiff received from the SSA, and she suggested that they establish that the "legality and the amount of the overpayment," as well as the amounts recouped by the SSA, are in question (*see id.*). Counsel also argued that even if ALJ Ryan determined Plaintiff was overpaid, the overpayments were not his fault because: (1) the "SSA was well aware during 2002 and continuing that [Plaintiff] was engaged in part-time work of 4 hours per week, 4 to 5 days per week [sic]" for IJM, and that Plaintiff had advised the SSA of this work "on numerous occasions"; and (2) Plaintiff believed his earnings were not above the SGA threshold (Tr. 196). Finally, counsel asserted that Plaintiff could not afford to repay any overpayment (*id.*).

On July 25, 2008, the ALJ issued a decision in which he concluded, essentially, that Plaintiff was overpaid between January 2004 and June 2007, and he was not entitled to a waiver, as the SSA previously found (*see* Tr. 11–16). Plaintiff requested review of the ALJ's decision, which request

---

[7] Plaintiff was born on December 11, 1941, and thus was sixty-two years of age on December 11, 2003. Therefore, counsel asserted, he was eligible for early retirement benefits as of December 11, 2003, and had the SSA processed his request for SSR in late 2004, overpayments would not have arisen based on Plaintiff's engaging in SGA (*see* Tr. 195; Doc. 11 at 7; 20 C.F.R. § 404.415(a)).

Case No. 3:10cv534/LAC/EMT

was denied by the Appeals Council on October 18, 2010 (Tr. 5, 2). Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court. <u>Ingram v. Comm'r of Soc. Sec. Admin.</u>, 496 F.3d 1253, 1262 (11th Cir. 2007); 42 U.S.C. § 405(g). This appeal followed.

II.   STANDARD OF REVIEW and ANALYSIS OF CLAIMS RELATED TO OVERPAYMENT

Judicial review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence and whether proper legal standards were applied. *See* <u>Lewis v. Callahan</u>, 125 F.3d 1436 (11th Cir. 1997). Supporting evidence need not be preponderant to be substantial so long as it amounts to more than a scintilla; in other words, it is such relevant evidence that a reasonable person might accept as adequate to support the conclusion reached. *See id.* at 1440. If the decision is supported by substantial competent evidence from the record as a whole, a court will not disturb that decision. Neither may a court reweigh the evidence nor substitute its judgment for that of the ALJ. *See* <u>Wolfe v. Chater</u>, 86 F.3d 1072 (11th Cir. 1996); *see also* <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1221 (11th Cir. 2002). This "substantial evidence" standard of review applies equally to overpayment and waiver determinations. *See* <u>Viehman v. Schweiker</u>, 679 F.2d 223, 227 (11th Cir. 1982).

In a case such as this, where the Commissioner has determined that an overpayment has been made, the Commissioner shall: (1) require such overpaid person to refund the amount in excess of the correct amount; or (2) "decrease any payment . . . payable to his estate or to any other person on the basis of the wages and self-employment income which were the basis of the payments to such overpaid person"; or (3) obtain recovery by means of reduction in tax refunds; or (4) apply any combination of the foregoing. 42 U.S.C. § 404(a)(1)(A). However, "there shall be no adjustment of payments to, or recovery by the United States from, any person who is *without fault* if such adjustment or recovery would defeat the purpose of [Title II] or would be against equity and good conscience." 42 U.S.C. § 404(b) (emphasis added).

In considering whether an overpaid person is at fault, the Commissioner should take into account any physical, mental, educational, or linguistic limitation the overpaid individual may have, *id.*, as well as his age. 20 C.F.R. § 404.507. Fault may be found in instances where, for example,

the overpaid individual made an incorrect statement he knew or should have known to be incorrect, failed to furnish information he knew or should have known to be material, or accepted a payment which he either knew or could have been expected to know was incorrect. *See id.* Conversely, the SSA may find an individual to be without fault if he "accepts such overpayment because of reliance on erroneous information from an official source within the [SSA] . . . with respect to the interpretation of a pertinent provision of the [SSA] or regulations pertaining thereto . . . ." 20 C.F.R. § 404.510a.

Even if an individual is found to be without fault, however, waiver of overpayment can be granted only if recovery of the overpayment would either defeat the purpose of Title II or would be against equity and good conscience. 42 U.S.C. § 404(b); *see also* 20 C.F.R. § 404.506(a). A recovery defeats the purpose of Title II if it "deprives a person of income required for ordinary and necessary living expenses." 20 C.F.R. § 404.508(a). A recovery is against equity and good conscience if an individual "[c]hanged his position for the worse . . . or relinquished a valuable right . . . because of reliance upon a notice that a payment would be made or because of the overpayment itself . . . ." 20 C.F.R. § 404.509(a)(1).

III.   DISCUSSION

Plaintiff raises several claims for relief, as follows: (1) the alleged overpayments were not calculated correctly; (2) the overpayments were not Plaintiff's fault, recovery by the SSA would be against equity and good conscience, and he cannot afford to repay the alleged overpayments; (3) the ALJ erred in finding Plaintiff's statements untruthful as to events that transpired following his first notification of a potential overpayment; and (4) the ALJ erred by failing to fully and fairly develop the record (*see* Doc. 11).[8]

Before addressing Plaintiff's claims for relief, it is helpful to review the ALJ's specific findings relevant to those claims. Initially, the ALJ found that Plaintiff returned to work in January 2001 (Tr. 13). Next, the ALJ found that Plaintiff continued to work throughout his TWP and EPE, and that his work in 2002 and from January 2004, forward, constituted SGA (*id.*). Therefore, the

---

[8] Because Plaintiff's claims overlap, some will be combined and considered together, *infra*.

DIB paid to Plaintiff between January 2004 and June 2007 constituted overpayments (*id.*).[9] The ALJ then considered whether Plaintiff was entitled to a waiver of the overpayments, and in doing so he addressed the issue of Plaintiff's "fault" (Tr. 14). More specifically, the ALJ considered Plaintiff's report that as soon as he became aware of the first alleged overpayment, in or about late October 2004, he requested that his DIB benefits be immediately converted to SSR (*id.*). The ALJ found the alleged report:

> not credible because if [Plaintiff] had, in fact, requested conversion of his disability benefits to early retirement benefits, he would have been instructed of the necessity of the filing of an application for retirement insurance benefits in order to effectuate such a transition. (20 C.F.R. § 404.310(c)). A review of SSA's records does not reflect that [Plaintiff] had ever scheduled an appointment with a claims representative to discuss the conversion of his benefits or that he ever filed an application for retirement insurance benefits during the relevant period under consideration. Additionally, the claimant has produced no documentation that he even attempted to file said application nor has he provided any dates or contacts to support his contention. The claimant was not eligible for early Social Security Retirement benefits unless he filed an application for said benefits.

(Tr. 14–15).

Continuing, the ALJ addressed Plaintiff's arguments that the "alleged amount of the overpayment was incorrect and that the alleged overpayment has been recouped" (Tr. 15). He deemed Plaintiff's argument "moot," because "the monies SSA withheld from [Plaintiff] were being withheld from monies [he] was not entitled to receive" (*id.*). And in conclusion, the ALJ stated as follows:

> When all of the foregoing factors are considered in combination, it is clear [that] Plaintiff] did not return the Social Security benefit payments which he knew, or reasonably should have known, were incorrect, based on his admitted longstanding familiarity with his reporting responsibilities. The undersigned [ALJ] is not at all persuaded by [Plaintiff's] testimony [sic] and his alleged sequence of events. [Plaintiff] knew that he had not filed an application for retirement benefits or taken any other action to convert the status of his benefit payments and he continued to

---

[9] As discussed more fully, *infra*, the ALJ did not decide whether Plaintiff's DIB payments in 2002 were overpayments, but Plaintiff did not seek review of that determination by the SSA, although he now questions whether accurate amounts were recouped as to the 2002 overpayments (*see, e.g.*, Doc. 11 at 3; *see also* Tr. 40, 195–96).

> receive monthly disability benefit payments for over two years after he had been notified that he was not entitled to receive those benefits. [Plaintiff] possessed the individualized ability to understand and appreciate that the benefits received represented incorrect payments. There is no showing of [an] inability to comprehend his actions. His conversion of such incorrect payments for personal use (whether needed or not) represents fault that caused the overpayment at issue. As such, the undersigned [ALJ] cannot find [Plaintiff] 'without fault' in the acceptance of payments which he either knew or should have been expected to know were incorrect, regardless of the Social Security Administration's erroneous overpayment of benefits to him. Therefore, any recovery of the resultant overpayment of benefits to him cannot be waived.

(Tr. 15). Considering all of the foregoing, the undersigned now addresses Plaintiff's claims.

      A.      Whether the Overpayments Were Calculated Correctly

Plaintiff appears to first claim that the SSA recovered more than $9,459.70, the amount it determined Plaintiff was overpaid in 2002, although he acknowledges that his income in 2002 exceeded the SGA threshold and that the SSA was entitled to recoup the "legitimate overpayment" (*see* Doc. 11 at 3, 7–8). In arguing that the SSA collected more than what was owed, Plaintiff states that $597.20 was withheld from his monthly payments for a period of <u>sixteen</u> months, in the total amount of $9,555.20 (16 x 597.20 = 9,555.20), and an additional amount of $481.70 was withheld in the seventeenth month, resulting in a total withholding of $10,036.90 (9,555.20 + 481.70 = 10,036.90) (*id.* at 3). As previously discussed however, the relevant withholding schedules reflect that $597.20 would be withheld from Plaintiff's monthly payments for a period of <u>fifteen</u> months beginning in either December 2004 or June 2005, and the balance of $481.70 would be withheld in the sixteenth month (*see* Tr. 202, 204). This results in a total withholding of $9,439.70, a $20.00 difference in Plaintiff's favor. Thus, Plaintiff has not established error.

In his second "miscalculation" claim, Plaintiff notes he received <u>no</u> benefits for a period of "[fifteen]" months, from December 2004, forward, or from June 2005, forward (Doc. 11 at 3 & n.1). Plaintiff therefore contends he could not have been overpaid each and every month between January 2004 and June 2007 (a forty-two month period), as the SSA and ALJ ultimately concluded, because he received no payments for fifteen months during this period (Doc. 11 at 5, 6–8). Plaintiff's claim, however, appears to be based on a misunderstanding of how the SSA computed his benefits. In

short, in October 2004 the SSA determined that Plaintiff had been overpaid each month in 2002, in the total amount of $9,459.70 ("the original overpayment"). In November 2004, the SSA informed Plaintiff it would use the benefits he was currently due to reduce the original overpayment, and it proceeded to do so commencing in either December 2004 or June 2005. In mid-2007, however, the SSA determined that Plaintiff was not entitled to any benefits between January 2004 and June 2007 ("the additional overpayments"). Thus, the additional overpayments, that ultimately totaled $27,708.50, accrued throughout the time the SSA recouped the original overpayment, even though in some months Plaintiff received no payments. As the ALJ stated, "the monies SSA withheld from the claimant [during the forty-two month period] were being withheld from monies the claimant was not entitled to receive" (Tr. 15). Thus, Plaintiff is not entitled to relief based on the arguments presented here.

  B.  Whether Plaintiff was "At Fault" with Regard to the Overpayments
     Whether ALJ Erred in Discrediting Plaintiff's Statement

  Plaintiff questions the "legality and amount" of the additional overpayments (Doc. 11 at 6). In support, Plaintiff asserts several theories, none of which are persuasive. Plaintiff first contends that as of December 11, 2003, he was sixty-two years of age and eligible for early SSR, "which he requested be commenced sometime in 2004" (Doc. 11 at 7). Even if Plaintiff actually made such a request, by his own admission he did not request a conversion to early SSR until after he received the SSA's first notice of overpayment, dated October 23, 2004, so his request would have had no effect on the additional overpayments that accrued during most of 2004. Regardless, the ALJ found Plaintiff's assertion that he requested a conversion "not credible." In so finding, the ALJ noted that Plaintiff has never stated the date on which he allegedly made a request for early SSR. Moreover, the SSA has no record of a request by Plaintiff for early SSR (*see, e.g.*, 20 C.F.R. § 404.310(c) (to obtain early SSR one must "apply," which is defined in § 404.303 as "to sign a form or statement that the [SSA] accepts as an application")). Indeed, the Appeals Council confirmed in its notice denying Plaintiff's request for review, dated October 18, 2010, that "both the record before the [ALJ] and the [SSA's] electronic records do not indicate that any application for retirement insurance benefits has ever been filed with the [SSA]" (Tr. 2–3). Further, Plaintiff did not indicate in his

request for reconsideration or waiver of the additional overpayments that he requested early SSR and, therefore, that his DIB should have been converted to SSR in or about late 2004. Additionally, as the ALJ noted, Plaintiff presented no corroborating information, such as the name of a person with whom he spoke at the SSA about this very important request, a copy of any application made for early SSR, or a statement from his wife or any other witness who knew he applied for SSR, attempted to so apply, or otherwise advised the SSA of his desire to apply for early SSR. Furthermore, Plaintiff did not testify at his hearing concerning this fact, or any other, even though the ALJ asked his counsel if "there [was] anything further [they] could do" before adjourning, to which counsel replied "no" (Tr. 224). Indeed, the representation was first made by Plaintiff's counsel in her letter to ALJ Ryan, dated June 20, 2008. Finally, to accept the representation made by Plaintiff—a person who obviously received numerous communications from the SSA and interacted with the agency since at least 1997—one would have to accept that Plaintiff did nothing other than make one verbal request in late 2004 to convert his DIB to early SSR, even though the SSA never mailed to Plaintiff <u>any</u> correspondence suggesting, confirming, or otherwise acknowledging that a request had been made. Stated another way, had Plaintiff actually made the request, it is reasonable to believe he would have contacted the SSA—at some point during the <u>years</u> that followed his request—to ask why the SSA had taken no action whatsoever on the request. There is, however, no evidence suggesting that Plaintiff made any such inquiry. The undersigned thus concludes that the ALJ did not err in finding Plaintiff's statement "not credible."

      Next, Plaintiff claims the SSA "proved it knew of [Plaintiff's] work when they began writing him in [late October] 2004, so any overpayment could not have been his fault after that time" (Doc. 11 at 7 (citing 20 C.F.R. § 404.510(g), which states that in some circumstances an individual may be without fault if the SSA continues to issue "benefit checks to him after he sent notice to the Administration of the event which caused or should have caused the deductions provided that such continued issuance of checks led him to believe in good faith that he was entitled to checks subsequently received.")). The provision cited by Plaintiff is inapplicable here. Section 404.510 discusses when an individual is "without fault" with regard to a <u>deduction overpayment</u>. *See* 20

C.F.R. § 404.510.[10] The provision applicable here is 20 C.F.R. § 404.510a, which discusses when an individual is "without fault" with regard to an entitlement overpayment, such as a benefit payment under Title II. As previously noted, section 404.510a states in relevant part that an individual is without fault if he "accepts such overpayment because of reliance on erroneous information from an official source within the [SSA] . . . with respect to the interpretation of a pertinent provision of the Social Security Act or regulations pertaining thereto." 20 C.F.R. § 404.510a. Here, Plaintiff has not alleged—and the record does not support a finding—that anyone affiliated with the SSA provided erroneous information to him. Further, even if Plaintiff had requested a conversion to early SSR in late 2004, and the SSA failed to comply, such failure is not the same as an SSA official providing erroneous information. Thus, Plaintiff has not established he is "without fault," as described in section 404.510a.

Plaintiff's other contentions relevant to the instant claim essentially suggest that the SSA, not Plaintiff, is at "fault." For example, Plaintiff contends he informed the SSA on "numerous occasions" that he was working (a contention for which he offers no evidentiary support[11]), that he believed his income did not exceed the SGA threshold, and that he requested an early conversion to SSR. Even if these contentions are true, however, the inquiry does not end there. "Social Security law does not ask whether SSA is at fault. Rather, in order for the Plaintiff to avoid having to return erroneously paid benefits, the burden is on him to show that he bears no fault." Martinez v. Astrue, No. 10-80723-CIV, 2011 WL 679851, at *4 (S.D. Fla. Feb. 1, 2011); see also 20 C.F.R. § 404.507 ("*Fault* as used in *without fault* . . . applies only to the individual"; thus, even if the SSA was at fault in making an overpayment, that fact alone would not relieve the individual of liability for repayment).

---

[10] Even if the provision cited by Plaintiff applies, the provision adds the qualifier "provided that such continued issuance of checks led him to believe in good faith that he was entitled to checks subsequently received." 20 C.F.R. § 404.510(g). As discussed next, there is no persuasive showing that the circumstances led Plaintiff to believe in good faith that he remained entitled to ongoing disability benefit payments despite his work and earnings.

[11] The ALJ stated in his decision that Plaintiff returned to work in January 2001 and "did, in fact, notify SSA that he had returned to work" (Tr. 13). The basis for this statement is not apparent from the record, but it does not change the result here. As explained in this Report, merely notifying the SSA of work does not relieve an individual of liability for overpayments. Moreover, Plaintiff's notification to the SSA of his work in 2001 does not establish that he notified the SSA of his work or earnings in 2004 through 2007, the years at issue in this appeal.

Here, regardless of any alleged fault by the SSA, the record establishes that Plaintiff was at fault because he failed to furnish information he knew or should have known to be material, or because he accepted a payment which he either knew or could have been expected to know was incorrect, or both. 20 C.F.R. §§ 404.507(b), (c). To illustrate, Plaintiff was advised in October 2004 that he was overpaid in 2002. Thus, by October 2004—at the latest—Plaintiff was on notice that overpayments occur when monthly income exceeds the SGA threshold. Perhaps more telling, however, is the fact that Plaintiff knew in October 2004 that his monthly income in 2002, <u>which was only $814.58</u> (*see* Tr. 31), was enough to exceed the SGA threshold, yet in October 2004 and thereafter Plaintiff earned <u>substantially more</u> than he did in 2002 (*see* Tr. 31–32 (reflecting Plaintiff's monthly earnings of $2,100.00 (in 2004), $2,615.92 (in 2005), and $3,600.00 (in 2006 through May 2007))). There is no evidence, however, to establish that Plaintiff brought the matter of his increasing income to the attention of the SSA. Plaintiff knew, or at a minimum should have known, that his earnings in 2004, 2005, 2006, and 2007 were well above the SGA threshold.

Plaintiff's inaction falls far short of the high degree of care generally expected by a DIB recipient, especially considering, as the ALJ found, that Plaintiff had the ability to understand his actions and a longstanding familiarity with his reporting responsibilities (Tr. 15; *see also* Tr. 13 (ALJ's noting the obligations Plaintiff agreed to when he originally applied for DIB)). Moreover, Plaintiff does not challenge the ALJ's findings regarding his abilities or familiarity with reporting obligations. *See* <u>Martinez</u>, 2011 WL 679851, at *3 (discussing "high degree of care" owed and finding that claimant should have known that continued receipt of DIB after he returned to work was where wrong where, among other circumstances, there was no allegation of any sort of impediment that would have hindered his understanding of his obligations); 20 C.F.R. § 404.1588 (stating that a person receiving DIB is required to report to the SSA any event that may change his disability status, <u>including an increase in earnings</u>). *Cf.* <u>Jefferson v. Bowen</u>, 794 F.2d 631, 633 (11th Cir. 1986) (noting that the fault determination is based on subjective criteria, such as intelligence and education, and finding no fault where, among other circumstances, the claimant's "ability to fathom SSA forms was limited" and she relied on oral assurances of the SSA) (citing <u>Rini v. Harris</u>, 615 F.2d 625, 627 (5th Cir. 1980) (claimant's health, status as high school dropout, and reliance on SSA

officials were circumstances that showed claimant was without fault)). In <u>Martinez</u>, a case in which the claimant was more far more proactive than Plaintiff in reporting material information to the SSA, the court in denying the claimant relief stated as follows:

> The Plaintiff relies heavily on the fact that he actually did tell SSA of his return to work. . . . The purpose of both letters [sent to the SSA in 2003] was to apply for early retirement benefits, not to inform SSA that he no longer was disabled. The two letters that he wrote in 2004 [advising the SSA of his work <u>and</u> attaching pay stubs], in comparison, do demonstrate such an attempt, and SSA still ignored them. Why SSA continued to make payments despite such clear notification is unexplained. However, . . . Social Security law does not ask whether SSA is at fault. Rather, in order for the Plaintiff to avoid having to return erroneously paid benefits, the burden is on him to show that he bears no fault.
>
> The Plaintiff also relies heavily on the argument that he believed the continued payments were no longer for [DIB] but rather for his retirement benefit. While it is true that at the time the Plaintiff did ask to start receiving the early retirement benefit, his argument ultimately is unpersuasive. The Plaintiff did not even raise this point until the time of the administrative hearing. The Plaintiff made no mention of it in his earlier correspondence to SSA. Moreover had the Plaintiff believed in 2003 that the monthly payment now was the retirement benefit, he should have seen no need to write SSA in 2004 to tell them to stop paying the disability benefit. SSA certainly sent not [sic] notice to him saying that it had converted his benefit from disability to retirement.
>
> Despite his attempts to have the disability payment stopped, SSA continued to pay it, but the Plaintiff took no further action. The Plaintiff offers no explanation as to what led him to believe that the continued receipt of disability benefits was proper. . . . Although SSA kept paying disability benefits, the Plaintiff makes no persuasive argument why he thought he would be entitled to keep them. Rather it appears that the Plaintiff's approach was to allow SSA to persist in its error.

<u>Martinez</u>, 2011 WL 679851, at *4.

Thus here, as in <u>Martinez</u>, Plaintiff has not met his burden of demonstrating that he bears no fault. Accordingly, there is substantial evidence to support the ALJ's finding that Plaintiff was not "without fault."

C.  Whether Recovery Would Be Against Equity and Good Conscience
    Whether Plaintiff Can Afford to Repay the Overpayments

The Act allows for a waiver of an overpayment if the individual is *without fault* in causing the overpayment and recovering the overpayment would defeat the purposes of the Act or would be against equity and good conscience. *See* 20 C.F.R. § 404.506(a); 42 U.S.C. § 404(b); Davis v. Bowen, 840 F.2d 822, 824 (11th Cir. 1988). Thus, this court need not consider whether recovery would defeat the purpose of the Act or be against equity or good conscience because Plaintiff is not without fault. Similarly, while a claimant's finances are considered in determining whether recoupment would defeat the purposes of the Act, *see* 20 C.F.R. § 404.508, the inquiry is made only if a claimant is without fault. *See, e.g.,* 20 C.F.R. § 404.506(a). Accordingly, it matters not whether Plaintiff can afford to repay, and no further discussion of these claims is warranted.

D.  Whether the ALJ Erred in Finding Plaintiff Untruthful
    Whether the ALJ Erred by Failing to Fully and Fairly Develop the Record

As previously discussed, the ALJ discredited the allegation that Plaintiff applied for early retirement, or indicated to the SSA his desire to do so, in October 2004. And, the undersigned previously concluded that the ALJ's reasons for discrediting this allegation are substantially supported by the record. In this claim for relief, however, Plaintiff contends the ALJ erred by discrediting the allegation without giving Plaintiff an opportunity to testify about it, or any other factors relevant to the determination of whether an overpayment waiver is appropriate (*see* Doc. 11 at 10). Plaintiff thus asserts that the record is incomplete because it lacks Plaintiff's testimony (*id.*). Plaintiff also alleges that the record is incomplete because portions of Plaintiff's hearing are inaudible, and because "certain relevant notices have not been added to the record" (*id.* at 10–11).

It is well established in this Circuit that the ALJ has an affirmative duty to develop a full and fair record. Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995); Lucas v. Sullivan, 918 F.2d 1567, 1573 (11th Cir. 1990); Smith v. Bowen, 792 F.2d 1547, 1551 (11th Cir. 1986); Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981). This duty requires that the ALJ "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts," be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited," Cowart, 662 F.2d at 735 (citations omitted), and "investigate the facts and develop the arguments both for and

against granting benefits." Crawford & Co. v. Apfel, 235 F.3d 1298, 1304 (11th Cir. 2000). That does not mean, however, that the ALJ must search to the last document to find every possible piece of relevant evidence. Rather, he must have sufficient evidence to decide the case.

### Plaintiff's Testimony

As previously noted, at Plaintiff's hearing held April 10, 2008, his counsel advised ALJ Ryan that Plaintiff had no witnesses. The ALJ then specifically stated that he was going to take Plaintiff's testimony, and he turned the hearing over to Plaintiff's counsel to do so (Tr. 219). Instead of questioning Plaintiff, however, counsel made a statement (*see id.*). Thereafter, the ALJ and counsel engaged in a rather lengthy conversation on the record (*see* Tr. 219–23), during which, in pertinent part, counsel stated she did not know if the ALJ wanted testimony from Plaintiff regarding the fault issue (*see* Tr. 223). The ALJ told counsel he would take Plaintiff's testimony if counsel thought it was necessary (*id.*). The ALJ also told counsel that she and Plaintiff could "come back," after counsel submitted her written correspondence to him, and he would take Plaintiff's testimony at that time (*id.*). Additionally, before concluding the hearing, ALJ Ryan asked counsel if anything further could be done, and counsel answered "no" (Tr. 224). Thus, Plaintiff had an ample opportunity to testify as his hearing, but he did avail himself of the opportunity. Likewise, the ALJ made it clear that he would take Plaintiff's testimony at a later date, if Plaintiff so requested, but no request was made in counsel's correspondence, submitted more than two months after Plaintiff's hearing (*see* Tr. 194–96), or otherwise. Plaintiff cannot now blame the ALJ for not taking his testimony when he never requested to testify. Thus, the ALJ did not err.

### Inaudible Portions of Plaintiff's Hearing

As previously noted, some portions of Plaintiff's hearing are inaudible, but the inaudible portions occurred almost entirely during the exchange between counsel and the ALJ regarding alleged discrepancies in some of Plaintiff's tax records (*see* Tr. 218–24). It is evident from this exchange, however, that counsel was making an argument—based on the income tax records in the file—that Plaintiff's income did not meet the SGA threshold in 2004 (or, potentially, in other years during which the additional overpayments accrued because counsel pointed to records from 2004 to illustrate her argument). Counsel, however, subsequently abandoned this argument, since she did

not include it in the letter she wrote to ALJ Ryan after Plaintiff's hearing, and it is not raised in this appeal. Similarly, none of the arguments asserted by counsel in her letter to ALJ Ryan, or in this appeal, require consideration—or a complete understanding—of the inaudible portions of the transcript. Thus, the record is not incomplete based on the inaudible portions of the hearing transcript.

<u>Missing Notices</u>

Plaintiff contends that "certain relevant notices" are missing from the record, but Plaintiff does not describe with any specificity the nature of the missing notices (*see* Doc. 11 at 11–12). Plaintiff also contends the record lacks "an accurate accounting and rationale for its continued deprivation of full retirement benefits long after any overpayment would have been paid off" (*id.* at 11). While the undersigned does not entirely understand counsel's latter contention, any issue as to "deprivation of full retirement benefits" is not properly before this court. Additionally, to the extent Plaintiff claims the additional overpayments were miscalculated or that the SSA recouped more than Plaintiff overpaid, the undersigned notes that Plaintiff's counsel made a similar contention at Plaintiff's hearing. In response, the ALJ stated, "You [Plaintiff's counsel] can make your argument in writing. You can pick it apart and tell me . . . why this overpayment should not, first of all, apply, or whether it was incorrectly computed, if that's your contention. . . . You can go down to the Social Security Office and go over those figures again with them. They'll do it." (Tr. 222).[12] The ALJ indicated he would give counsel thirty days to set up the conference, and counsel responded by stating "okay" (*id*. at 222–23). And as previously noted, the ALJ advised counsel to submit a letter to him, which could be submitted after she went the local SSA office, and include therein all arguments she wished to make on Plaintiff's behalf (*see id.* at 223).

Counsel submitted her letter to ALJ Ryan in late June 2008 (*see* Tr. 194–96). Counsel did not indicate in the letter that the SSA had documents that should have been incorporated into the

---

[12] Counsel told the ALJ that the records were "very confusing" to her, and the ALJ explained that the SSA would set up a meeting or conference with her to go over the records and explain them to her (Tr. 222). It is evident that ALJ Ryan genuinely believed that counsel was confused and that a trip to the local SSA office would assist her in understanding Plaintiff's paperwork; ALJ Ryan went so far as to suggest that counsel tell the SSA personnel she had "orders" (presumably from him) to go and they had "orders" to meet with her (*see id.*).

Case No. 3:10cv534/LAC/EMT

record, and she did not ask that any additional documents be so incorporated (*id.*). Indeed, in support of her written arguments she referenced only those exhibits that were then in the record (*see id.*), which are the same exhibits that were in the record at the time of Plaintiff's hearing.[13] Likewise, counsel did not request a supplemental hearing or additional time to further develop her arguments as to the amount of the additional overpayments, the SSA's recoupment of those overpayments, or any other matter related to the issues raised in this appeal.[14] Plaintiff has therefore failed to establish that relevant evidence is missing. Stated another way, Plaintiff has not demonstrated that the record "show[s] the kind of gaps in the evidence necessary to demonstrate prejudice." Graham v. Apfel, 129 F.3d 1420, 1423 (11th Cir. 1997). Accordingly, the undersigned concludes that the ALJ had sufficient evidence to decide the case, and Plaintiff is not entitled to relief on this claim.

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at 1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 27th day of February 2012.

                                             s/ *Elizabeth M. Timothy*
                                             **ELIZABETH M. TIMOTHY**
                                             **UNITED STATES MAGISTRATE JUDGE**

---

[13] As noted *supra*, at the outset of the hearing, Plaintiff's counsel advised ALJ Ryan that Plaintiff's file was complete, and she needed no additional time to submit other exhibits (Tr. 218–19).

[14] Counsel did not indicate in her letter whether she went to the local SSA office or not, but it would have been prudent for her to go to the office in light of her discussion with ALJ Ryan and her apparent agreement to go. Moreover, it is evident that the ALJ was certainly willing to consider whether the SSA made an accounting error, and he gave counsel time to develop the argument (and, of course, to supplement the argument with any information she might have received at the SSA office). Her failure to supplement the argument—in her letter to ALJ Ryan or here—suggests that she uncovered no accounting error or relevant document that should have been included in the record. While the undersigned is mindful of the ALJ's obligation to develop the record, in the circumstances presented here the undersigned finds no fault—or reversible error—related to the ALJ's actions, including his suggestion that counsel visit the local SSA office to either better understand Plaintiff's situation or uncover an error related to Plaintiff's payments.

Case No. 3:10cv534/LAC/EMT

**NOTICE TO THE PARTIES**

Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).